# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 14-20128

United States Court of Appeals
Fifth Circuit

**FILED**

October 16, 2015

Lyle W. Cayce
Clerk

JUAN RAMON TORRES; EUGENE ROBISON,

Plaintiffs - Appellees

v.

S.G.E. MANAGEMENT, L.L.C.; STREAM GAS & ELECTRIC, L.T.D.; STREAM S.P.E. G.P., L.L.C; STREAM S.P.E., L.T.D.; IGNITE HOLDINGS, L.T.D; ET AL,

Defendants - Appellants

Appeal from the United States District Court
for the Southern District of Texas

Before JOLLY, WIENER, and CLEMENT, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Stream Energy, its marketing arm Ignite, and a number of other defendants (collectively, the "Defendants") appeal the district court's order certifying a class of some 150,000 plaintiffs (the "Plaintiffs") in this civil action brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68.  The Plaintiff investors are Independent Associates in Ignite's multi-level marketing program, who are claiming to be victims of an illegal pyramid scheme.  Specifically, the Plaintiffs claim that the Defendants induced the Plaintiffs to participate in the scheme by

No. 14-20128

misrepresenting that Ignite is a legitimate business opportunity, causing them to suffer monetary losses.

The Defendants argue both that Ignite is not an illegal pyramid scheme and, more significantly relevant here, that class certification is inappropriate because individualized questions of reliance and knowledge predominate over any common issues, defeating class certification under Rule 23(b)(3) of the Federal Rules of Civil Procedure. The district court rejected the Defendants' argument and certified the case as a class action. This Court granted the Defendants leave to file this interlocutory appeal under Federal Rule of Civil Procedure 23(f). After full briefing and argument, we VACATE the district court's class certification order and REMAND the case for the entry of a proper order not inconsistent with this opinion and for such further proceedings as may be appropriate.

## I.

Stream Energy began in 2004 as a venture to provide energy services in deregulated energy markets. Stream does not own energy infrastructure. Instead, it resells gas and electricity that it buys from other utilities. According to Stream, it can provide consumers with cheaper services through this arrangement. Stream began its operations in Texas after it received approval from the Texas Public Utility Commission in 2005. Beginning in 2008, Stream sought to expand beyond Texas, and it has expanded operations to other states, including Georgia, Maryland, New Jersey, New York, and Pennsylvania. According to Stream, it has over one million energy customers, and it has sold billions of dollars in electricity and natural gas. It claims that the vast majority of its revenues come from energy sales, not from the profits it receives from its multi-level marketing system.

This appeal, however, primarily involves Ignite and its multi-level marketing venture designed to promote Stream's energy services to

consumers.[1] To participate in Ignite's marketing program, a willing individual pays a fee, typically $329, and may also pay an additional, but optional, monthly fee for an Ignite-based website, or "homesite," to promote his or her Ignite marketing efforts. In return, the individual becomes an "Independent Associate," or "IA," within the Ignite program and receives marketing materials along with opportunities to attend training sessions hosted by Ignite executives and other successful IAs. The IAs may then recruit potential energy customers for Stream as well as additional IAs to join the Ignite program.

Ignite compensates IAs in three primary ways. First, as the Defendants emphasize, IAs receive a monthly commission based on the number of customers they have recruited to purchase energy from Stream. Ignite calls this income Residual Income or Monthly Energy Income ("MEI"). Second, IAs receive compensation for recruiting other IAs into Ignite, which Ignite calls Leadership Income. Finally, Ignite also compensates IAs for completing an initial recruitment of energy customers and IAs in a prompt manner. Ignite has developed a "3&10" model, through which a new IA recruits three new IAs and ten new customers. By meeting various targets, an IA is entitled to receive various payments of what Ignite calls Quick Start Income.

An IA's success depends primarily on recruiting a "downline" of other IAs who, in turn, recruit *other* IAs and customers into the Ignite program. As an IA recruits more IAs into the Ignite program, the IA proceeds up an Ignite ladder of leadership positions. All IAs start out as Directors, the lowest level of the Ignite leadership. By recruiting more IAs, the IA can move up three additional leadership levels, to Managing Director, then to Senior Director,

---

[1] Many of the individual Defendants in this appeal came to Ignite after working at Excel Telecommunications, a failed long-distance company that offered long-distance services in the deregulated telecommunications market through a similar multi-level marketing program.

and finally to Executive Director. By building a downline, the IA also receives MEI for the customers whom the downline IAs recruit to join Stream, along with bonuses for recruiting additional IAs. As Ignite touts in its marketing materials, "the power of Ignite's Leadership Income plan is that these bonuses are paid not just to five levels, but on every level to unlimited depth. That's geometric growth to infinity!"

For its top recruiters, Ignite also developed a "Presidential Director" level. Presidential Directors received luxury cars and other perks from Ignite. Many of these individuals promoted the opportunities of the Ignite program at events across the country.

Ignite has promoted its multi-level marketing program through many forms of media. Ignite developed a magazine called *Empower*, which featured profiles of the most successful IAs along with other stories encouraging prospective IAs to join Ignite. Presidential Directors promoted Ignite through presentations to IAs and prospective IAs. For example, Presley Swagerty, known as the "Coach," and Randy Hedge, known as the "Cowboy," were particularly prolific in promoting Ignite through videos, presentations, and conference calls. Ignite also produced a series of videos and presentations explaining the basic structure of the program, and IAs were encouraged to show these presentations to prospective IAs to inform them about the program.

In addition to its own promotional activities, Ignite drew attention from a number of outside media sources. The Plaintiffs allege that, as early as 2005, the *Dallas Morning News* published a story on Ignite that included a quote from a marketing professor suggesting that Ignite was a pyramid scheme. In years following, the *Dallas Morning News*, the *Atlanta Journal-Constitution*, and other media outlets began to feature stories indicating that Ignite may be a pyramid scheme. Indeed, IAs reported to Ignite executives and the

No. 14-20128

Presidential Directors that many prospective IAs asked them to address rumors that Ignite was an illegal pyramid scheme.

Although the parties appear to dispute the numbers, the clear majority of IAs have lost money as a result of participating in Ignite. In contrast, a small number of individuals have made significant sums of money.

This suit was brought by former IAs Juan Ramon Torres and Eugene Robison, who allege that Stream, Ignite, and various individual defendants have violated RICO. They have sought to certify a class consisting of those IAs who have lost money as a result of participating in Ignite's program. The district court granted the Plaintiffs' motion and certified a class.[2] In its certification order, the district court considered whether the Plaintiffs could establish the proximate cause element of their RICO claim through common evidence of reliance. The district court concluded that the Plaintiffs could not establish classwide reliance on any particular misrepresentation; but it certified the class because it ruled that the Plaintiffs were entitled to an inference of reliance, which a jury could draw from the fraudulent and illegal nature of a pyramid scheme. Thus, the district court held that, if the Plaintiffs can prove that Ignite is a pyramid scheme, which the parties concede requires only common proof, then the jury is entitled to infer that the Plaintiffs only invested in the pyramid scheme in reliance on an implicit representation that Ignite is a legitimate business. This interlocutory appeal followed.

Thus, to summarize, the Plaintiffs seek to certify a class action for victims of an alleged pyramid scheme. The underlying cause of action is

---

[2] The district court defined the class more broadly than the Plaintiffs' proposed definition, extending the class to "all IAs who joined Ignite on or after January 1, 2005, through April 2, 2011, excluding the IAs subject to the Eleventh Circuit opinion in *Betts* [*v. SGE Management, LLC*, 402 F. App'x 475 (11th Cir. 2010)]." Thus, the district court did not explicitly limit the class to consist only of those IAs who lost money by participating in Ignite.

brought under RICO. The Plaintiffs allege that they were defrauded because the Defendants misrepresented to them that Ignite was a legitimate company when it was not. Ordinarily, the Plaintiffs must show that the class relied on this misrepresentation in making their investment. The Plaintiffs have not offered evidence that such an actual representation was ever made or that they relied on such a misrepresentation. They argue, however, that such a general representation, and reliance thereon, can be inferred, essentially because such a representation is inherent in all investment opportunities and it is only on such a reliance that a rational investor would invest in Ignite.

To establish a class action, the Plaintiffs must show that the evidence of reliance is common to the class and predominates over individualized issues of reliance under Rule 23(b)(3). In this connection, the Plaintiffs must show (if inferred reliance is indeed a viable theory) that there is no other reasonable scenario that could explain the investors' decisions to invest, other than the inferred misrepresentation that Ignite offered a legitimate business opportunity. Here, we hold that the Plaintiffs have not met this standard.

This appeal involves several complex and overlapping issues. First, we will discuss the standard for class certification under Rule 23(b)(3), along with the substantive elements of the Plaintiffs' RICO claim, which bears on the class certification issue. We will also explain the district court's basis for class certification, which the Plaintiffs adopt on this appeal. Then, we will describe the typical aspects of a pyramid scheme, along with the specific representations, which suggest that Ignite might be a pyramid scheme. Finally, we will consider the relevant legal authorities and explain why the Plaintiffs' case falls short under these precedents. For these reasons, we will conclude that the Plaintiffs' class must be decertified.

No. 14-20128

II.

A.

The Defendants' appeal seeks an interlocutory review of the district court's ruling on class certification. Thus, we begin with a discussion of the standards applicable to our review of class certification orders.

District courts exercise substantial discretion when deciding whether to certify a class, and we will reverse only if the district court abused its discretion or applied an erroneous legal standard. *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999). At the same time, we are mindful that "[t]he class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). Consequently, a plaintiff seeking to certify a class "must affirmatively demonstrate his compliance" with Rule 23 of the Federal Rules of Civil Procedure. *Id.* at 2551. The Plaintiffs have the initial burden of demonstrating that the litigation should proceed on a class-wide basis. *See Howard v. City of Greenwood*, 783 F.2d 1311, 1313 n.2 (5th Cir. 1986) (concluding that "the plaintiffs failed to sustain their burden of proving" the necessary commonality to support class certification under Rule 23(b)(3)).

On appeal, the Plaintiffs have focused their argument to contend that class certification was appropriate specifically under Rule 23(b)(3).[3] "A class may be certified under Rule 23(b)(3) only if it meets the four prerequisites found in Rule 23(a) and the two additional requirements found in Rule

---

[3] In the district court, the Plaintiffs sought certification under Rule 23(b)(2) and Rule 23(b)(3). The district concluded that the Plaintiffs were not entitled to certification under Rule 23(b)(2) but certified the class under Rule 23(b)(3). Both parties now focus exclusively on certification under Rule 23(b)(3).

No. 14-20128

23(b)(3)."[4] *Mullen*, 186 F.3d at 623. The parties do not presently dispute that the Plaintiffs meet the requirements of Rule 23(a). Instead, the arguments address whether the Plaintiffs have satisfied Rule 23(b)(3), which permits class certification if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Although Rule 23(b)(3) requires both "predominance" of common questions of law and

---

[4] Rule 23(a) provides as follows:

One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

Then, Rule 23(b)(3) provides that the district court may certify the putative class if:

the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

fact and "superiority" of a class action as a remedy, the Defendants here focus only on the predominance requirement.

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). In short, "[w]here the plaintiff seeks to certify a class under Rule 23(b)(3), the Rules demand 'a close look at the case before it is accepted as a class action.'" *Madison v. Chalmette Ref., L.L.C.*, 637 F.3d 551, 554 (5th Cir. 2011) (quoting *Amchem*, 521 U.S. at 615).

B.

We must consider the predominance issue under Rule 23(b)(3) in the light of the elements of the Plaintiffs' cause of action. *See Castano v. Am. Tobacco Co.*, 84 F.3d 734, 744 (5th Cir. 1996) (recognizing that "a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues"). The Plaintiffs' claims here are RICO claims; thus, we turn to discuss the elements of a civil RICO claim.

RICO provides, *inter alia*:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). Additionally, RICO prohibits conspiracies to violate § 1962(c). *Id.* § 1962(d). A plaintiff may bring a civil action for RICO violations under § 1962 if he or she is "injured in his business or property *by reason of a violation* of section 1962 of this chapter." *Id.* § 1964(c) (emphasis added).

This appeal thus implicates § 1964(c), which we have held requires "a showing that the fraud was the 'but for' cause and 'proximate' cause of the

No. 14-20128

injury." *Sandwich Chef of Tex., Inc. v. Reliance Nat'l Indem. Ins. Co.*, 319 F.3d 205, 218 (5th Cir. 2003). The Plaintiffs alleged a pattern of racketeering activity consisting of acts of mail and wire fraud. *See* 18 U.S.C. § 1341 (mail fraud); 18 U.S.C. § 1343 (wire fraud). We have traditionally required a plaintiff presenting a civil RICO claim based on predicate acts of mail and wire fraud to establish proximate cause by showing that he or she relied on a defendant's fraudulent misrepresentations. *See In re Mastercard Int'l Inc.*, 313 F.3d 257, 263 (5th Cir. 2002) ("[A]lthough reliance is not an element of statutory mail or wire fraud, we have required its showing when mail or wire fraud is alleged as a RICO predicate."). The Supreme Court has since held, however, "that a plaintiff asserting a RICO claim predicated on mail fraud, need not show, either as an element of its claim or as a prerequisite to establishing proximate causation, that it relied on the defendant's alleged misrepresentations." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 661 (2008). Although *Bridge* dispenses with *first* party reliance, "none of this is to say that a RICO plaintiff who alleges injury 'by reason of' a pattern of mail fraud can prevail without showing that *someone* relied on the defendant's misrepresentations." *Id.* at 658. The extent to which *Bridge* alters the reliance requirement in RICO class actions is not at issue on appeal, however, as the Plaintiffs concede that proximate cause in their case depends on reliance. The Plaintiffs argue instead that they have set forth an adequate common theory of reliance.

C.

The Plaintiffs must establish that they can prove reliance through common evidence, as we have said that a class action cannot be certified if proof of reliance will depend on individualized evidence:

> [A] district court [considering a motion for class certification] must perform sufficient analysis to determine that class members' fraud claims are not predicated on proving individual reliance. If the circumstances surrounding each plaintiff's alleged reliance on

10

> fraudulent representations differ, then reliance is an issue that
> will have to be proven by each plaintiff, and the proposed class fails
> Rule 23(b)(3)'s predominance requirement.

*Unger v. Amedisys Inc.*, 401 F.3d 316, 321 (5th Cir. 2005). The Defendants argue that the Plaintiffs' theory of reliance is necessarily an individualized inquiry.

Relying on the extensive record, the Defendants point out that the Plaintiffs were subject to abounding representations about Ignite, including: (1) positive and negative treatment in the popular press; (2) Ignite's standard forms and marketing materials, which new IAs received; and (3) varying presentations from Presidential Directors who attempted to recruit new IAs to join Ignite in presentations throughout the country. Because the record establishes that each Plaintiff was subject to different representations about Ignite, the Defendants argue that each Plaintiff must establish causation by: identifying a particular misrepresentation that he or she received; and then showing that the misrepresentation *caused* the Plaintiff to invest in Ignite, thereby causing his or her loss. Similarly, the Defendants argue that even if the Plaintiffs can make this showing, they are also entitled to rebut this evidence with other evidence in the record, which might suggest that the Plaintiffs knew that Ignite was an illegal pyramid scheme. *See Sandwich Chef*, 319 F.3d at 218–19 (recognizing that knowledge, which is actually a defense to causation, is a relevant consideration when addressing class certification). In sum, the Defendants contend that the nature of the proof in this case on the issue of proximate cause will necessarily be individualized, meaning that common issues of law and fact will not predominate over this significant individualized issue.

The district court recognized that the Plaintiffs could not show through common proof that they received an actual common misrepresentation about

Ignite. Instead, the district court acknowledged that the Plaintiffs would have to show the receipt of a misrepresentation through individualized proof and that it was certainly possible that some class members may have known from Ignite's marketing pitches that it was a pyramid scheme. Nonetheless, the district court certified the class on a second ground, that is, it concluded that a jury could "infer" reliance if the Plaintiffs could establish that Ignite was a pyramid scheme. The district court explained its decision as follows:

> Although the litany of reasons that any individual class member signed up to become an IA may vary, common sense compels the conclusion that every IA believed they were joining a lawful venture. That the defendants' business opportunity is allegedly an unlawful pyramid scheme in which the vast majority of participants are sure to lose money, gives rise to an inference that the only reason the class members paid the $329 sign-up fee (and possibly other fees) is because the true nature of the 'opportunity' was disguised as something it was not. As such, establishing proximate cause would not be an individualized inquiry; rather, it could be determined as to all the class members at once. Because it can rationally be assumed (at least without any contravening evidence) that the legality of the Ignite program was a bedrock assumption of every class member, a showing that the program was actually a facially illegal pyramid scheme would provide the necessary proximate cause.

On appeal, the Plaintiffs defend class certification on this basis, arguing that they can establish proximate cause merely by establishing that Ignite was a pyramid scheme.

The Plaintiffs' theory relies not on a particular misrepresentation, but instead on a "common sense" inference of reliance, which exists from the nature of pyramid schemes. According to the Plaintiffs, a pyramid scheme is a unique species of fraud because pyramid schemes are both illegal and require participants to profit in the scheme by victimizing others, which, in the context of Ignite, were most often friends and family. Thus, the Plaintiffs argue that the fact-finder is entitled to infer that the Plaintiffs relied on a

No. 14-20128

misrepresentation regarding Ignite's legitimacy if the Plaintiffs can prove that Ignite is a pyramid scheme, which the parties agree can be done through common proof. Thus, the common proof that the Plaintiffs offer in this case is evidence that Ignite is actually a pyramid scheme; and this evidence, they claim, is sufficient to establish causation as well.

In response to this argument, the Defendants argue that the individualized representations are still relevant. Even if Ignite was a pyramid scheme, they say, it provided investors at the top of the scheme with an opportunity to profit. Some individuals who lost money might still have invested in the hope that they would be near the top of the pyramid. In this connection, pyramid schemes are little different from other species of fraud—some knowing participants in the fraud will profit, whereas many others will lose money. Thus, the Defendants urge us to decertify the class so that the Defendants can rebut the Plaintiffs' common theory of reliance through individualized trials.

For the reasons that will follow, we conclude that the Plaintiffs' claimed common theory of reliance does not hold together.

III.

First, the Plaintiffs' theory of reliance depends on the premise that a pyramid scheme is a unique type of fraud. We thus begin with a brief discussion of pyramid schemes and turn to the actual representations about the Ignite business, which are part of the record in this case.

A.

The Plaintiffs rely on *Webster v. Omnitrition International, Inc.*, 79 F.3d 776 (9th Cir. 1996), to define the basic characteristics of an illegal pyramid scheme. We now turn to the description of pyramid schemes in that case.

Initially, we should be clear that a "pyramid scheme" can be distinguished from the many types of businesses organized in a "pyramid-

shaped" hierarchical structure. A true pyramid scheme, as that term is used here, refers to a type of illegal and fraudulent activity, structured in a fashion that it "must eventually collapse." *Id.* at 781. Pyramid schemes, unlike pyramid-structured organizations, will collapse because such schemes are designed to produce income from the continuous recruitment of new members into a constantly narrowing sales market and not upon sales revenue from a legitimate product to consumers in a normal market. *Id.* at 781–82. In short, the scheme collapses when those recruited to sell dwarf the market of those available to buy.

There are typically two elements to such a pyramid scheme: (1) payment to an entity in return for the right to sell its product; and (2) the right, in exchange for the payment, to receive rewards from the entity that are based almost exclusively on the recruitment of new program participants. *Id.* at 781. Under this standard, some businesses that engage in retail sales may still be a pyramid scheme if "[t]he promise of lucrative rewards for recruiting others tends to induce participants to focus on the recruitment side of the business at the expense of their retail marketing efforts, making it unlikely that meaningful opportunities for retail sales will occur." *Id.* Thus, the primary factor in deciding whether a business is a pyramid scheme is whether the business focuses exclusively or almost exclusively on *recruiting* as opposed to *sales*.

Pyramid schemes, however, are not losing propositions for all investors. Instead, "pyramid schemes may make money for those at the top of the . . . pyramid, but 'must end up disappointing those at the bottom who can find no recruits.'" *Id.* at 781 (quoting *In re Koscot Interplanetary, Inc.*, 86 F.T.C. 1106, 1181 (1975)). Thus, an individual who participates in a pyramid scheme necessarily takes a gamble that she will be reasonably near the top of the pyramid. Although an individual may lose money if it turns out that she

invested at the wrong time, this misjudgment does *not*, a fortiori, mean that the individual is irrational. Such an investor may have rationally assumed both that the business was a pyramid scheme *and* that the investment was worth the gamble of being near the top of the pyramid. So, with this background, we turn to examine some of the representations regarding Ignite in this case.

## B.

The record suggests that Ignite often promoted its multi-level marketing program as just this sort of gamble to prospective IAs. Ignite's Presidential Directors, who traveled the country promoting Ignite to IAs and prospective IAs, implied that Ignite was a pyramid scheme. In presentations to IAs and prospective IAs, these officers repeatedly underscored that the way to make money was by *recruiting other IAs*, not *recruiting customers*. The record shows, for example, that Greg McCord admonished IAs in one presentation that "if you keep concentrating on customers, you won't make money." Although these Presidential Directors did not use the term "pyramid scheme" to describe Ignite, a reasonable prospective IA could reasonably construe these representations as the hallmarks of a pyramid scheme: Ignite predominately pushes recruiting over selling, and thus expanding the number of IA participants, over customer acquisition.[5] *See Webster*, 79 F.3d at 782.

Some representations were even more direct. Presidential Director Randy Hedge repeatedly referred to the multi-level marketing business as a "pyramid." To illustrate, he told his audience on one occasion: "I don't care if you call [Ignite] an octagon, parallelogram, rectangle—they're sending me a check." In another presentation, he shared an anecdote about recruiting an

---

[5] Although many of these pitches targeted IAs, the Presidential Directors apparently often gave these presentations at widely-attended, "revival style" events attended by IAs and prospective IAs alike.

individual into Ignite after calling it a "pyramid deal" because the prospective IA was only really interested in whether the deal was "makin' any money." Similarly, various media outlets began to investigate whether Ignite was a pyramid scheme. The Plaintiffs suggested in their complaint that the *Dallas Morning News* published a story in 2005, which contained an indication that Ignite could be an illegal pyramid scheme. Other media outlets produced similar critical reports about Ignite in 2010 and 2011.

These promotions, although supportive of the Plaintiffs' contention that Ignite is a pyramid scheme, also buttress the Defendants' position in opposition to class certification, i.e., these comments suggest that the Plaintiffs will have to prove RICO causation by relying on individualized, and not common, proof of reliance. The Plaintiffs argue that these individualized representations about Ignite drop from the case, however, based on the strength of their proposed inference. Specifically, the Plaintiffs claim that a jury should infer that the Plaintiffs did *not* rely on these representations because a rational investor would not participate in a pyramid scheme.

## IV.

Turning to the Plaintiffs' argument that reliance may be inferred, we hold that reliance cannot be inferred merely because a business is alleged to be a pyramid scheme, particularly when the record in this case suggests that investors were told that it was a pyramid scheme. Such an inference is unsupported by our precedents or by the precedents in other circuits.

### A.

#### 1.

We begin with a discussion of our relevant precedents. Generally, proximate cause of the alleged injury (here, misrepresentations caused monetary loss) is a distinct element of a RICO claim, which must be established separately from proving an underlying fraud. Thus, even *if* the Plaintiffs can

establish through common evidence that the Defendants engaged in fraudulent or illegal conduct, common issues of law and fact do not predominate over individualized issues unless the Plaintiffs can establish through common evidence that the fraudulent conduct *caused* their injury. *See Patterson v. Mobil Oil Corp.*, 241 F.3d 417, 419 (5th Cir. 2001) ("While there may be an issue of fact common to all class members—the question of whether or not Mobil was a valid subscriber to the workers' compensation system—that question does not predominate over the question of whether or not each member of the class suffered a RICO injury."). In *Patterson*, we concluded that a plaintiff could establish proximate cause, and thus prove a RICO injury, by showing "that she could have and would have sued Mobil, but did not do so because the asserted false statements led her to believe her suit to be barred by the workers' compensation regime." *Id.* Obviously, such a showing of proximate cause would depend on the individual circumstances and motivations of each plaintiff; and these types of individualized inquiries "defeat the economies ordinarily associated with the class action device." *Id.*

This point is illustrated by a case that bears a striking resemblance to this case. *Sandwich Chef*, 319 F.3d at 224. In *Sandwich Chef*, the district court certified a class action against a group of insurance companies, on the basis that they had charged excessive premiums by sending inflated invoices to policyholders and misrepresented the correctness of the premium charged. *Id.* at 211. Evidence in the record also suggested that the charged rates were illegal. *Id.* at 212. Nonetheless, we decertified the class. *Id.* at 224. We reasoned that the plaintiffs in *Sandwich Chef* could not prove proximate cause through common proof, because individualized issues of knowledge and reliance would overwhelm any common proof. *Id.* at 220–21. Specifically, we pointed out that the plaintiffs and the defendants negotiated the insurance policies in individualized transactions; and evidence in the record suggested

that the plaintiffs could have voluntarily assented to the illegal rate structures so that they could receive other benefits in return. *See id.* at 212–13, 220–21. Because the proof suggested that at least some of the plaintiffs could have knowingly participated in the fraud, we held that the defendants were entitled to undercut the plaintiffs' evidence of reliance "with evidence that might persuade the trier of fact that policyholders knew the amounts being charged varied from rates filed with regulators and that they had agreed to pay such premiums." *Id.* at 220.

In sum, our precedents do not support an inference of reliance from fraudulent conduct, even when the fraudulent conduct at issue is illegal. Instead, we have recognized that, in most cases, reliance will naturally turn on evidence that will differ from case to case. Individual plaintiffs will receive different pitches to join a business, and they will have differing expectations in terms of what they expect to receive from the business. Generally, the defendants are entitled to probe these differences at trial by presenting evidence that the plaintiffs knew of the fraud, yet nonetheless participated in it because they believed that it would benefit them.

2.

The Plaintiffs argue, however, that precedents in other circuits allow for an inference of reliance in certain RICO fraud cases; and they further contend that such an inference is warranted on the facts of this case. The Plaintiffs primarily rely, on appeal, on three decisions from other circuits, to which we now turn.

First, they point to *Klay v. Humana*, in which the Eleventh Circuit approved the certification of a class of physicians who alleged that a group of health maintenance organizations ("HMOs") defrauded the physicians out of adequate reimbursement for their services rendered by programming their computer systems to pay the physicians less than they were entitled. 382 F.3d

No. 14-20128

1241, 1260 (11th Cir. 2004). The *Klay* court concluded that the plaintiffs' claims could be certified as a class action because a jury could infer reliance, stating:

> It does not strain credulity to conclude that each plaintiff, in entering into contracts with the defendants, relied upon the defendants' representations and assumed they would be paid the amounts they were due. A jury could quite reasonably infer that guarantees concerning physician pay—the very consideration upon which these agreements are based—go to the heart of these agreements, and that doctors based their assent upon them. . . . Consequently, while each plaintiff must prove reliance, he or she may do so through common evidence (that is, through legitimate inferences based on the nature of the alleged misrepresentations at issue).

*Id.* at 1259. The Second Circuit reached a similar conclusion in a case involving fraudulent overbilling. *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108 (2d Cir. 2013). Relying on *Klay*, the *Foodservice* court allowed the case to proceed as a class action, in part because "payment may constitute circumstantial proof of reliance based on the reasonable inference that customers who pay the amount specified in an inflated invoice would not have done so absent reliance upon the invoice's implicit representation that the invoiced amount was honestly owed." *Id.* at 120.

Finally, the Tenth Circuit in *CGC Holding Co. v. Broad & Cassel* confronted a certified class of prospective borrowers who paid a non-refundable "loan commitment fee" for a loan that the lender never intended to issue. 773 F.3d 1076, 1082 (10th Cir. 2014). There, the court concluded that the class could proceed because a fact-finder could infer that the plaintiffs paid the fee in reliance on a misrepresentation that the transaction was legitimate. *See id.* at 1091–92. Specifically, the court reasoned that such an inference was appropriate in significant part because the victims of the fraud "were completely deprived of any benefit from their transaction." *Id.* at 1093.

19

No. 14-20128

In sum, these cases allow for class certification based on an inference of reliance when all individualized issues truly drop out of the case. In each of these cases, a class of plaintiffs paid a sum of money or declined full payment for services rendered without receiving anything of value in return. Additionally, there was no evidence in the cases to suggest any other rational explanation for the plaintiffs' behavior other than that they were duped by the defendants. Thus, those courts allowed class certification because the *only* reasonable explanation for the plaintiffs' behavior was that they relied on a misrepresentation.

### B.

Turning to the record in this case, we conclude that the Plaintiffs' evidence does not support a sufficient inference of reliance. Individuals may knowingly choose to invest in a pyramid scheme such as Ignite for any number of reasons, most notably because Ignite provides an opportunity to make money. Thus, the class cannot be certified under our precedents or the precedents cited by the Plaintiffs because individualized issues of reliance and knowledge will be relevant to each Plaintiff's case.

### 1.

First, the mere fact that this case involves a pyramid scheme does not take this case outside our well-settled precedents regarding predominance in both *Patterson* and *Sandwich Chef*. Although the Plaintiffs may be able to establish common proof of a fraud, the common evidence that a fraud existed is not common evidence that the Plaintiffs were *injured by* the fraud.

This case is less compelling for class certification than *Patterson*. In *Patterson*, there was a common misrepresentation, i.e., the defendant allegedly misrepresented to them that it had workers' compensation insurance. Here, it is not clear that all Plaintiffs were told that Ignite was a lawful business, given the differing pitches to differing prospective IAs. It appears that some

No. 14-20128

prospective IAs received only versions of the pitch that Ignite provided an opportunity for them to make significant sums of money.  Additionally, even if the Plaintiffs here *could* establish an actual common misrepresentation that Ignite was a legitimate business, they would still have to show that they were injured by the misrepresentation.  In *Patterson*, we recognized that the plaintiffs had to show that they would have sued Mobil had they known that the misrepresentation about its insurance was false.  241 F.3d at 419.  Just as there are many reasons why a party would choose to file or not file a lawsuit, there are many reasons why someone would choose to join or not join a pyramid scheme.  The evidence here suggests that investing in Ignite was quite similar to gambling—individuals could have become IAs as "a form of escape, a casual endeavor, a hobby, a risk-taking money venture, or scores of other things." *Poulos v. Caesars World, Inc.*, 379 F.3d 654, 668 (9th Cir. 2004).

Nor is a pyramid scheme unique because it is illegal.  In *Sandwich Chef*, the plaintiffs accused the defendants of lying to state regulators and charging illegal rates.  319 F.3d at 212.  Nonetheless, we also pointed out that the evidence suggested that the plaintiffs could very well *want* their insurance policies to deviate from filed rates because such deviations could actually benefit the plaintiffs in other respects.  *Id.* at 213.  Thus, we decertified the class because the defendants were entitled to show through individualized evidence that the plaintiffs "knew the amounts being charged varied from rates filed with regulators and that they had agreed to pay such premiums." *Id.* at 220.

A pyramid scheme is no different from the insurance regime in *Sandwich Chef*.  By joining Ignite, an IA had the opportunity to make money, perhaps even significant sums of money, by building a large pyramid beneath them. Although the Plaintiffs suggest that they would not join a pyramid scheme like Ignite because such a scheme would depend in large part on defrauding friends

No. 14-20128

and family members, this supposed distinction is unavailing. First, an individual could rationally believe that he could make money for friends and family members if they were *all* investing at the top of the pyramid. Indeed, the record reflects that the Presidential Directors regularly told prospective IAs that they had enriched their spouses, children, and friends by bringing them into the Ignite program. Second, the same arguments could be made about gambling, i.e., that spending money on gambling harms an individual's family. But gambling is just the type of activity where no such broad assumptions can be made about the reasons for human behavior. *See Poulos*, 379 F.3d at 668. And finally, the Plaintiffs have cited no case law that has adopted such an elevated view of human nature.

Thus, the Plaintiffs will have to rely upon individualized proof, and not a generalized inference, to establish proximate cause in each particular RICO case.[6]

2.

In that connection, the Plaintiffs' cases also fail to support class certification on the basis of an inference of reliance. *Klay*, *Foodservice*, and *CGC* all involved fraudulent schemes in which the plaintiff victims had no hope of recovering their investments. The courts could not point to any evidence that might provide an alternative explanation for the plaintiffs' conduct other than that they relied on a misrepresentation that they might profit.

By contrast, an investor could reasonably choose to knowingly invest in a pyramid scheme in the hope that they would make money. As we have

---

[6] We note as well that, even if the Plaintiffs could establish reliance through an inference, the Defendants would still be entitled to offer the evidence in the record regarding the misrepresentations about Ignite to probe each Plaintiff's knowledge in individualized trials. *See Sandwich Chef*, 319 F.3d at 220. Knowledge is a defense to a RICO fraud claim, and the Defendants would be entitled to present this evidence on an individualized basis, as pertains to each Plaintiff. *See id.* at 220–21.

No. 14-20128

already explained, a pyramid scheme provides an opportunity for those at the top of the pyramid to profit from their investments. *Webster*, 79 F.3d at 781. While many of the Plaintiffs might have decided to invest in the scheme in the belief that it was legal, it is equally possible that many of the Plaintiffs chose to invest in the scheme in the belief that, legal or illegal, it provided them with an opportunity to make money.

Additionally, the representations at issue in this litigation are far more varied than the misrepresentations in *Klay*, *Foodservice*, and *CGC*. In each of those cases, the many individual representations essentially said the same thing—the invoices and bills provided either an amount due or an amount paid, representing that the stated amount was correct. By contrast, the representations here vary in their contents. Some of Ignite's marketing materials touted its legitimacy, whereas other presentations undermined that legitimacy. To recover on their RICO claims, the Plaintiffs must show that they relied upon the former materials, and not the latter; they may only do so through individualized proof. Thus, the class must be decertified.

V.

In sum, the district court erred in certifying the class because common questions of law and fact will not predominate over individualized inquiries into causation and knowledge. The case is therefore REMANDED for the entry of an order, VACATING the order of certification and for such further proceedings as may be appropriate and not inconsistent with this opinion.

VACATED and REMANDED.

23

No. 14-20128

WIENER, Circuit Judge, dissenting:

I am compelled to respectfully dissent today by the realization that the panel majority's opinion will vaccinate illegal pyramid schemes against *all* civil litigation, immunizing them not just from class actions but ultimately from all judicial challenges. By erecting this barrier to class certification based on nothing more than the theoretical possibility of prior knowledge of illegality, the panel majority creates an insurmountable barrier in this circuit to future class certification of cases that claim the presence of an illegal pyramid scheme. But, even worse, because individuals who are duped into joining such schemes uniformly invest relatively few dollars, none will possibly be able to afford to litigate their individual claims separately. Absent the availability of a class action, there simply will be no possibility of court challenges to such pyramid schemes.

The majority opinion will serve to instruct trial courts in this circuit to deny class certification on the merely theoretical possibility of a class member's knowledge of the fraud without requiring the defendant to adduce evidence of actual investor knowledge of illegality. Because illegal pyramid schemes are certain to be indistinguishable (to the average consumer) from legal multi-level marketing programs, all such arrangements are likely to present some indication of "illegality." Thus, defendant schemers will always have some basis to demonstrate *possible* knowledge of the fraud on the part of potential class members and thereby defeat reliance.

I readily acknowledge that even if a class action were certified here, the defendants might go on to prove that their enterprise is legal and legitimate.[1]

---

[1] Any inference of reliance at the class certification stage is only that and nothing more: "the sole result of this inference is that the class members will not be required to testify as to their reliance on the [defendants'] misrepresentations and omissions." *CGC Holding Co.*

24

No. 14-20128

But, that will never be known. Absent the availability of a class action such as the one sought in the instant civil RICO suit, no putative prevailing plaintiff will be able to afford to litigate his or her claim individually.[2] The victims of such schemes are never big investors with huge losses (as they usually are in Ponzi schemes). Rather, they are virtually always unsophisticated individuals whose relatively small losses can never justify separate litigation of their claims.[3] Absent the availability of a class action through which to pursue the claims of all similarly situated parties in globo, the founders and operators of illegal pyramid schemes will be totally shielded from civil litigation and thus from civil liability. Here, this means that over 200,000 plaintiffs will be left entirely without recourse.

At bottom, this appeal requires us to decide whether aspiring class members—allegedly the victims of an allegedly illegal pyramid scheme—can show proximate causation through common evidence sufficient to satisfy Federal Rule of Civil Procedure 23(b)(3)'s predominance requirement at the

---

*v. Broad & Cassel*, 773 F.3d 1076, 1093 (10th Cir. 2014). The "inference does not shift the burden of proof at trial on the element of RICO causation (or any other elements of the claim)—plaintiffs will still have to *prove* RICO causation by a preponderance of the evidence to win on the merits." *Id.* "Similarly, the trier of fact is not required to accept the inference; it is merely permitted to utilize it as common evidence to establish the class's *prima facie* claims under RICO." *Id.*

[2] *Reyes v. Netdeposit, LLC*, ___ F.3d ___, 2015 WL 5131287, at *18 (3d Cir. Sept. 2, 2015) ("Class actions are often the only practical check against the kind of widespread mass-marketing scheme alleged here. The individual claims arising from such conduct are usually too small to justify suit unless aggregated in a class action. This is particularly true when, as is often the case, the scheme targets unsophisticated consumers with little disposable income and without the means or wherewithal to seek assistance of legal counsel. As a practical matter, the average victim of such a scheme nearly always finds it far easier—and much cheaper—to reluctantly accept any loss and move on than to undertake the expense and inconvenience endemic in the protracted process of trying to recover a few dollars years later.").

[3] At oral argument, the plaintiffs' counsel represented that the average loss of each potential class member is $200 to $300.

initial class certification stage. The defendants contend that the district court erred in certifying the plaintiffs' claim that the defendants induced them to participate in an illegal pyramid scheme by misrepresenting Ignite as a legitimate business opportunity, thereby causing the plaintiffs to suffer monetary losses.

Although the defendants vociferously deny that Ignite is an illegal pyramid scheme, the panel majority selectively cherry picks the factual record to reach the conclusion that it is at least possible that the putative class members had some knowledge that the scheme was illegal. In doing so, the majority allows the defendants to contend that the plaintiffs knowingly participated in the fraud, all the while maintaining that there was none. The majority holds that the mere "possibility" that class members knew of Ignite's illegality creates individualized issues of reliance sufficient to defeat class certification. I am firmly convinced that, to the contrary, the district court—to which we owe considerable deference—correctly ruled that the plaintiffs can adequately demonstrate proximate causation through common proof, making class certification appropriate. Satisfied that the plaintiffs may rely on a common inference of reliance and that the district court did not err in so holding, I would affirm the district court's class certification. Here's why.

## I.

We review a district court's class certification decision under the very deferential abuse of discretion standard "in 'recognition of the essentially factual basis of the certification inquiry and of the district court's inherent power to manage and control pending litigation . . . . Whether the district court

applied the correct legal standard in reaching its decision on class certification, however, is a legal question that we review de novo.'"[4]

To certify a class, initially the party seeking certification must comply with Federal Rule of Civil Procedure 23. That party must first satisfy Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy of representation.[5] Next, that party must satisfy one of Rule 23(b)'s three provisions.[6] Here, the plaintiffs rely on subsection (3) of Rule 23(b), "which requires that questions of law or fact common to the class predominate over questions affecting only individual class members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."[7] The defendants do not dispute the district court's Rule 23(a) determination and contend only that it erred in finding Rule 23(b)(3)'s predominance requirement met. "Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action."[8]

## II.

To establish a civil RICO violation here, the plaintiffs must demonstrate proximate causation.[9] Although they need not necessarily prove first-party reliance, the plaintiffs "must establish at least third-party reliance in order to prove causation."[10] The district court held that the plaintiffs may establish

---

[4] *Regents of Univ. of Cal. v. Credit Suisse First Bos. (USA), Inc.*, 482 F.3d 372, 380 (5th Cir. 2007) (quoting *Allison v. Citgo Petrol. Corp.*, 151 F.3d 402, 408 (5th Cir. 1998)).

[5] Fed. R. Civ. P. 23(a).

[6] Fed. R. Civ. P. 23(b).

[7] *Ahmad v. Old Republic Nat. Title Ins.*, 690 F.3d 698, 702 (5th Cir. 2012) (citing Fed. R. Civ. P. 23(b)).

[8] *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011).

[9] *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654 (2008).

[10] *Id.* at 659, 661 ("RICO's text provides no basis for imposing a first-party reliance requirement.").

proximate causation through common proof. First, the district court recognized Ignite's implicit representation that it is a lawful venture.[11] Second, the district court held that the allegation that the defendants were running an illegal pyramid scheme supports an inference that the plaintiffs chose to participate in the Ignite program only because its illegal nature was hidden from them. Put simply, the plaintiffs could use a common inference that they relied on the implicit misrepresentation that Ignite presented a legitimate business opportunity. In so holding, the district court found that illegal pyramid schemes present a sure loss for the vast majority of participants. The court stated that "[b]ecause it can rationally be assumed (at least without contravening evidence) that the legality of the Ignite program was a bedrock assumption of every class member, a showing that the program was actually a facially illegal pyramid scheme would provide the necessary proximate cause."[12] Under this theory, if the plaintiffs are able to prove that Ignite was an illegal pyramid scheme—an element that will undoubtedly be satisfied by common proof—they will also prove both a misrepresentation and proximate causation.

As the district court noted, this theory is far from novel. Indeed, many courts, including the Second, Tenth, and Eleventh Circuits, have recognized that class certification is warranted in this context when proximate causation may be established through a "common sense" inference that the class members' actions cannot be explained by anything but reliance on the

---

[11] The defendants do not dispute this point, yet the majority notes that "it is not clear that all Plaintiffs were told that Ignite was a lawful business . . . ." This statement ignores that the alleged misrepresentation—that Ignite is a lawful venture—is implied.

[12] *Torres v. SGE Mgmt. LLC*, No. 4:09-CV-2056, 2014 WL 129793, at *9 (S.D. Tex. Jan. 13, 2014).

defendants' conduct.[13] In such cases, courts infer that "members of the plaintiff class relied upon the purported legitimacy of the defendant with which they transacted."[14]

For example, in *CGC Holding Co. v. Broad & Cassel*, a class of borrowers sued a group of lenders, claiming that, up front, the lenders fraudulently

---

[13] *See CGC Holding Co.*, 773 F.3d at 1089–90 ("In the RICO context, class certification is proper when 'causation can be established through an inference of reliance where the behavior of plaintiffs and the members of the class cannot be explained in any way other than reliance upon the defendant's conduct.'" (quoting *In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Practices Litig.*, 277 F.R.D. 586, 603 (S.D. Cal. 2011)); *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 120 (2d Cir. 2013) ("In cases involving fraudulent overbilling, payment may constitute circumstantial proof of reliance based on the reasonable inference that customers who pay the amount specified in an inflated invoice would not have done so absent reliance upon the invoice's implicit representation that the invoiced amount was honestly owed."); *Klay v. Humana, Inc.*, 382 F.3d 1241, 1259 (11th Cir. 2004) ("It does not strain credulity to conclude that each plaintiff, in entering into contracts with the defendants, relied upon the defendants' representations [of legitimacy] and assumed they would be paid the amount they were due."); *see also Cohen v. Trump*, 303 F.R.D. 376, 385 (S.D. Cal. 2014) ("Courts have found that reliance can be established on a class-wide basis where the behavior of plaintiffs and class members cannot be explained in any way other than reliance upon the defendant's conduct."); *Negrete v. Allianz Life Ins. Co. of N. Am.*, 287 F.R.D. 590, 611–12 (C.D. Cal. 2012) ("That Allianz annuities are allegedly inferior in value and performance to comparable investment products . . . gives rise to an inference that consumers decided to purchase the 'inferior' annuities because of the standardized marketing materials at issue in this litigation, for they otherwise had no reason to do so."); *Minter v. Wells Fargo Bank, N.A.*, 274 F.R.D. 525, 546 (D. Md. 2011) ("[I]t is reasonable to infer that plaintiff class members would not have transacted with Prosperity had they known Prosperity was not a legitimate lender . . . ."); *Robinson v. Fountainhead Title Grp. Corp.*, 257 F.R.D. 92, 95 (D. Md. 2009) ("[I]t would be a reasonable inference to assume that a class member who purchased services from Assurance Title relied on the legitimacy of that organization in paying the rate charged."); *Chisolm v. TranSouth Fin. Corp.*, 194 F.R.D. 538, 561 (E.D. Va. 2000) ("[Plaintiffs] clearly made payments in reliance upon the assurance that the process of repossession, sale and all subsequent steps were taken in conformity with the law and that their rights were protected. To conclude otherwise would deny human nature, run counter to the traditional presumption in favor of actors operating under rational economic choice, and leave the Court with an absurd conclusion."); *Minterme Peterson v. H&R Block Tax Servs., Inc.*, 174 F.R.D. 78, 84–85 (N.D. Ill. 1997) ("It is inconceivable that the class members would rationally choose to pay a fee for a service they knew was unavailable . . . . The only logical explanation for such behavior is that the class members relied on the RAL Fact Sheet's representation that they could take advantage of RAL by paying the requisite fee.").

[14] *Minter*, 274 F.R.D. at 546.

extracted nonrefundable loan commitment fees from the borrowers for loans that the lenders never intended to provide.[15] There, the plaintiffs sought class certification on the theory "that no rational economic actor would enter into a loan commitment agreement with a party they knew could not or would not fund the loans."[16] The Tenth Circuit held that "plaintiffs' payment of up-front fees allows for a reasonable inference that the class members relied on lenders' promises, which later turned out to be misrepresentations or omissions of financial wherewithal."[17]

In *In re U.S. Foodservice Inc. Pricing Litigation*, the Second Circuit upheld class certification in a similar context.[18] There, customers alleged that a food distributor engaged in a fraudulent overbilling scheme by producing inflated invoices, and the district court granted class certification. On appeal, the distributor asserted that individualized issues of reliance should defeat certification. The Second Circuit upheld the class certification, holding that proximate causation could be proved through a generalized inference of reliance:

> In cases involving fraudulent overbilling, payment may constitute circumstantial proof of reliance based on the reasonable inference that customers who pay the amount specified in an inflated invoice would not have done so absent reliance upon the invoice's implicit representation that the invoiced amount was honestly owed. Fraud claims of this type may thus be appropriate candidates for class certification because "while each plaintiff must prove reliance, he or she may do so through common evidence (that is,

---

[15] 773 F.3d at 1080.

[16] *Id.* at 1081.

[17] *Id.* at 1081, 1091–92 ("More specifically the fact that a class member paid the nonrefundable up-front fee in exchange for the loan commitment constitutes circumstantial proof of reliance on the misrepresentations and omissions regarding Hutchens's past and the defendant entities' ability or intent to actually fund the promised loan.").

[18] 729 F.3d at 120.

through legitimate inferences based on the nature of the alleged misrepresentations at issue)."[19]

Finally, in *Klay v. Humana, Inc.*, physicians alleged that health maintenance organizations (HMOs) conspired to underpay them for their services.[20] The alleged misrepresentations at issue were the HMOs' assurance that they would reimburse the physicians for medically necessary services and their provision of explanation of benefits (EOB) forms representing that they paid the physicians the proper amounts.[21] Despite recognizing individualized issues of reliance surrounding the EOB forms, the Eleventh Circuit found no such issues regarding the HMOs' "antecedent representations about [their] reimbursement practices":

> It does not strain credulity to conclude that each plaintiff, in entering into contracts with the defendants, relied upon the defendants' representations and assumed they would be paid the amounts they were due. A jury could quite reasonably infer that guarantees concerning physician pay—the very consideration upon which those agreements are based—go to the heart of these agreements, and that doctors based their assent upon them.[22]

Rejecting the district court's analysis and the applicability of this line of cases from other circuits, the majority now holds that the plaintiffs here cannot establish proximate causation through common proof because a few potential class members *might* have known of Ignite's illegal nature. Based on that theoretical possibility that a class member might have had actual knowledge of the scheme's illegality, the majority jumps to the conclusion that individual issues of reliance predominate. In so doing, the majority fundamentally

---

[19] *Id.* (quoting *Klay*, 382 F.3d at 1259).
[20] 382 F.3d at 1246.
[21] *Id.* at 1259.
[22] *Id.*

No. 14-20128

misunderstands—or misrepresents—the nature of pyramid schemes and ignores the absence of evidence, as found by the district court, suggesting that any class member had knowledge of Ignite's alleged illegality. The majority further errs in assuming that rational economic actors would knowingly participate in an illegal pyramid scheme. This leads to the majority's stripping these and future plaintiffs of any means to pursue class actions against pyramid schemes in this Circuit. And this, in turn, immunizes such illegal schemes from any judicial challenge because individual losses can never justify solo litigation of such claims.

**A.**

First, the majority's conclusion that the class members might have recognized the Ignite program as an illegal pyramid scheme is based on the false premise that such schemes are easily recognizable. A pyramid scheme is

> characterized by the payment by participants of money to the company in return for which they receive (1) the right to sell a product and (2) the right to receive in return for recruiting other participants into the program rewards which are unrelated to the sale of the product to ultimate users.[23]

But alone possessing these two characteristics does not make a pyramid scheme illegal.[24] Rather, "satisfaction of the second element of the . . . test is the *sine qua non* of a pyramid scheme . . . ."[25] For this reason, in determining a scheme's legality, careful attention must be paid to whether the program

---

[23] *In re Koscot Interplanetary, Inc.*, 86 F.T.C. 1106, 1181 (1975).

[24] Indeed, as the defendants note, many, presumably legal, multi-level marketing programs such as Mary Kay, Tupperware, Amway, and Avon use this approach. *See United States v. Gold Unlimited, Inc.*, 177 F.3d 472, 479–80 (6th Cir. 1999) ("Some structures pose less risk of harm to investors and the public, however, and authorities permit these programs to operate even though the programs contain some elements of a pyramid scheme.").

[25] *Webster v. Omnitrition Intern., Inc.*, 79 F.3d 776, 781 (9th Cir. 1996).

emphasizes *recruitment* over *marketing.* Notably, "[n]o clear line separates illegal pyramid schemes from legitimate multilevel marketing programs; to differentiate the two, *regulators* evaluate the marketing strategy (*e.g.*, emphasis on recruitment versus sales) and the percent of product sold compared with the percent of commissions granted."[26] Because illegal pyramid schemes are not easily recognizable and their (temporary) success rests on disguising the scheme, they are "inherently deceptive."[27] Indeed, "the very reason for [their] *per se* illegality . . . is their inherent deceptiveness and the fact that the futility of the plan is not apparent to the consumer participant."[28] Further obstructing a superficial judgment on whether a pyramid scheme is in fact illegal is that internal policies, such as those that "deter inventory loading and encourage retail sales,"[29] must be examined closely. Here, the majority assumes that the information necessary to make this determination was available to the class. But, just because an officer of a corporation—never mind its independent contractors or the media—insinuate that something is pyramid-like does not make it illegal.

The majority posits that isolated representations by Ignite could have or should have put class members on notice that they were joining an illegal pyramid scheme. Stated differently, the majority uses the very evidence on which the plaintiffs rely to establish that Ignite is an illegal pyramid scheme to reject a common inference of reliance. Although the record contains isolated representations by Ignite that emphasize recruiting over marketing or even reference the word "pyramid" in relation to Ignite, these random

---

[26] *Gold Unlimited*, 177 F.3d at 475 (emphasis added).

[27] *Kugler v. Koscot Interplanetary, Inc.*, 293 A.2d 682, 690 (N.J. Super. Ct. Ch. Div. 1972).

[28] *Webster*, 79 F.3d at 788 (citation and quotation marks omitted).

[29] *See id.* at 783 (citing *In re Amway Corp.*, 93 F.T.C. 618 (1979)).

representations fall well short of those that would be necessary to put enough class members on notice that they were joining an *illegal* pyramid scheme. As courts have long recognized, pyramid schemes are inherently deceptive, and their very success depends on keeping their illegality a secret.

More importantly, the line between a legal "multi-level marketing entity" and an "illegal pyramid scheme" is fuzzy at best. The two are likely indistinguishable to the typical consumer participants or even to the corporate officers themselves. Whether a scheme is illegal is often determinable only after the scheme has failed and extensive litigation. Courts, let alone the typical unsophisticated participants, cannot decide whether or not a scheme is illegal based only on a handful of isolated representations. Yet this is what the majority has done, and this is the very responsibility with which the majority now charges prospective consumer participants in pyramid schemes: they must immediately recognize a scheme as illegal when faced with divergent representations as to marketing and recruitment. It is simply unrealistic to require unsophisticated consumer participants to be so finely attuned to the intricate mechanics of sophisticated fraudulent schemes and to predict how those schemes will be viewed by regulators and courts.

More concerning to me is the reality that the panel majority's opinion provides illegal pyramid schemers with a free pass to avoid any court challenge by immunizing them from class actions. The majority allows such schemers to maintain the appearance of legitimacy while injecting just enough suspicion into the consumer marketplace to defeat class certification. Simply warning participants that "if you keep concentrating on customers, you won't make money," referring to the scheme as "an octagon, parallelogram, [or] rectangle," and calling the scheme a "pyramid deal," will now be sufficient to avoid all litigation and thus all liability. In other words, even if the program otherwise

holds itself out as a legitimate business opportunity and even emphasizes, as Ignite did, the importance of marketing over recruiting,[30] isolated intimations of illegality or stray remarks are all that it will take to put prospective consumer participants on notice of the fraud.[31]

---

[30] At least one iteration of Ignite's "Independent Associate Terms & Conditions" required participants to assent to the following acknowledgment:

> I understand that I will not receive any compensation whatsoever for the act of sponsoring or recruiting, and that I will only be compensated for selling Stream Energy products and services to customers and based upon activities of other IAs only to the extent of sales of Stream Energy products and services to customers.

(Underlining in original.) In its briefing, the defendants again confirm this point: "The **only** way an IA can receive any compensation is to sell energy to customers. Stream Energy pays **zero** compensation solely for recruiting." (Emphasis in original.)

[31] Recently, the Third Circuit recognized and avoided a similar problem to the one the majority now creates. In *Reyes*, 2015 WL 5131287, at *1, the plaintiffs sought certification on a RICO sham-enterprise theory, alleging that telemarketing firms contacted unsuspecting individuals and, in offering them something of little or no value, obtained bank account information later used to make unauthorized debits from the individuals' bank accounts. Recognizing the class members' sham theory of liability, the district court found that the class members failed to satisfy Rule 23(b)(3)'s predominance requirement "because different sales pitches were used and different products were pitched." *Id.* at *17. The Third Circuit rejected this analysis, holding:

> if absolute conformity of conduct and harm were required for class certification, unscrupulous businesses could victimize consumers with impunity merely by tweaking the language in a telemarketing script or directing some (or all) of the telemarketers not to use a script at all but to simply orally convey a general theme designed to get access to personal information such as account numbers.

*Id.* The court recognized further:

> although such subtle but irrelevant variations in the manner of defrauding members of the public would not insulate unscrupulous marketers from liability in individual suits, it would—for all practical purposes—insulate them from class actions. An interpretation of Rule 23 that places class actions beyond the reach of consumers who have been victimized by fraudulent schemers who are wise enough to adopt schemes with subtle (but meaningless) variations would invite the kind of consumer fraud that . . . is alleg[ed] here.

*Id.* at *18.

No. 14-20128

## B.

Second, even if participants could have reasonably recognized Ignite as an illegal pyramid scheme, I am convinced that the majority errs in rejecting a common inference of proximate causation in the absence of evidence demonstrating that participants had actual knowledge that Ignite was an illegal pyramid scheme. This approach by the majority is inconsistent with our precedent which requires evidence of actual knowledge, not the mere possibility of knowledge. The panel majority approvingly cites *Sandwich Chef of Texas, Inc. v. Reliance National Indemnity Insurance*,[32] categorizing it as "a case that bears a striking resemblance to this case." But, the majority ignores a crucial distinction. In *Sandwich Chef*, the insureds alleged that the insurers charged premiums in excess of approved rates and misrepresented the correctness of the premiums charged.[33] We rejected class certification because the insureds could not prove proximate causation through common proof. But there, the insurers not only contended that the insureds "were aware that [the insurance] carriers were charging them more than the filed rates," but also "*introduced evidence* that . . . class members individually negotiated with insurers regarding workers' compensation and insurance premiums."[34] Thus, "[k]nowledge that invoices charged unlawful rates, . . . according to a prior agreement between the insurer and the policyholder, would eliminate reliance and break the chain of causation."[35]

Unlike in *Sandwich Chef*, the district court here expressly found that there was *no* evidence that *any* class member knew Ignite was an illegal

---

[32] 319 F.3d 205 (5th Cir. 2003).
[33] *Id.* at 224.
[34] *Id.* at 220 (emphasis added).
[35] *Id.*

pyramid scheme![36] The district court made this finding after hearing argument and testimony, considering the evidence, reviewing the parties' submissions, and examining the record. As here we must deferentially review a district court's factual findings for abuse of discretion, I cannot join the majority in its endeavor to find its own facts without any deference—or recognition that such deference is owed—to the district court's factual determination.[37]

Reversing the district court's finding of an absence of evidence of class members' actual knowledge of the alleged fraud, the panel majority holds that individual issues of reliance predominate based on only a theoretical possibility. Critically, the majority's approach will preclude a predominance finding in each and every class action fraud case that requires a showing of reliance. Indeed, "if bald speculation that some class members might have knowledge of a misrepresentation were enough to forestall certification, then no fraud allegations of this sort (no matter how uniform the misrepresentation, purposeful the concealment, or evident plaintiffs' common reliance) could proceed on a class basis . . . ."[38]

---

[36] *See Torres*, 2014 WL 129793, at \*9 ("[I]t can rationally be assumed (at least *without any contravening evidence*) that the legality of the Ignite program was a bedrock assumption of every class member . . . ." (emphasis added)). Other courts have distinguished *Sandwich Chef* on the same basis. *See, e.g.*, *In re U.S. Foodservice*, 729 F.3d at 120 (distinguishing *Sandwich Chef* because "the record . . . contain[ed] *no such individualized proof* indicating knowledge or awareness of the fraud by any plaintiffs" (emphasis in original)).

[37] *See Credit Suisse First Bos.*, 482 F.3d at 380 (We review a district court's class certification decision "for abuse of discretion in recognition of the essentially factual basis of the certification inquiry and of the district court's inherent power to manage and control pending litigation . . . ." (quotation marks omitted)).

[38] *In re U.S. Foodservice*, 729 F.3d at 122; *see also Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 277 F.R.D. 97, 118–19 (S.D.N.Y. 2011) ("Sheer conjecture that class members 'must have' discovered [the misrepresentations] is insufficient to defeat Plaintiff's showing of predominance when there is no admissible evidence to support Defendant's assertions.").

No. 14-20128

## C.

Third, even assuming that an average prospective participant could have reasonably known that Ignite was an illegal pyramid scheme and that there is evidence of this knowledge, I find the panel majority's assumption that a rational economic actor would join an illegal pyramid scheme to be unreasonable. The majority hypothesizes that individuals might join illegal pyramid schemes to exploit them because early investors in such schemes just might reap profits from downstream investors. I note initially that the defendants presented *no* evidence that *any* class member joined or would have joined the Ignite program in spite of its illegality. The defendants only point to evidence of participants profiting from the scheme, contending that this is enough to indicate that a rational actor would knowingly participate in an illegal pyramid scheme. But this syllogism proves too much. That individuals can profit from illegal pyramid schemes does not necessarily support the conclusion that rational individuals will knowingly participate in illegal pyramid schemes.

More to the point, and as the district court noted, even though class members might have joined Ignite for a vast array of reasons, it flies in the face of reason to conclude that any of these reasons conflict with a universal "bedrock assumption" that Ignite presented a legitimate business opportunity. Simply put, in the face of almost certain losses, illegal pyramid schemes do not present the sort of opportunity in which a reasonably informed rational economic actor would invest. "Rational economic actors do not ordinarily conspire to injure themselves."[39] The assumption that class members

---

[39] *Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 220 (5th Cir. 2001).

knowingly participated in an illegal pyramid scheme rests on the slender reed that those class members either sought knowingly to become victims or knowingly to become fraudsters. Critically, in illegal pyramid schemes, it is mathematically inevitable that participants will become victims or will victimize others. It goes too far to assume that rational economic incentives motivate individuals to participate in illegal schemes when faced with these options. But this is what the majority holds.

Belying the logic of its approach, the majority analogizes participating in illegal pyramid schemes to gambling. They reason that knowing participation in an illegal pyramid scheme—an investment opportunity in which the vast majority of participants are sure to face losses or to defraud others—is similar to gambling, a recreational (or compulsive) game of chance.[40] Under this analysis, the majority estimates that individuals might choose to participate in illegal pyramid schemes for the same reasons they would choose to gamble: to make money, but also as a form of escape, a casual endeavor, or a hobby. Tellingly, though, the most notable cases in which courts have found a host of additional reasons explaining class members' conduct involved gambling and the consumer purchase of "light" cigarettes.[41] In *Poulos v.*

---

[40] *See, e.g.*, N.Y. Penal Law § 225.00(2) ("A person engages in gambling when he stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under his control or influence, upon an agreement or understanding that he will receive something of value in the event of a certain outcome."); *Id.* § 225.00(1) (defining the term "contest of chance" as "any contest, game, gaming scheme or gaming device in which the outcome depends in a material degree upon an element of chance, notwithstanding that skill of the contestants may also be a factor therein").

[41] *See Poulos v. Caesars World, Inc.*, 379 F.3d 654, 665–66 (9th Cir. 2004) ("[G]ambling is not a context in which we can assume that potential class members are always similarly situated. Gamblers do not share a common universe of knowledge and expectations."); *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 225 (2d. Cir. 2008) ("[E]ach plaintiff in this case could have elected to purchase light cigarettes for any number of reasons, including a preference for the taste and a feeling that smoking Lights was 'cool.'").

No. 14-20128

*Caesars World, Inc.*, the plaintiff-gamblers alleged that gambling machine manufacturers and casinos misrepresented electronic gambling devices as presenting true games of chance (like their mechanical counterparts) when, instead, computer programming predetermined individual outcomes.[42] Rejecting class certification, the Ninth Circuit held that individuals choose to gamble for a wide range of reasons, and the fact that a game is truly one of chance is not implicit in every class members' choice to gamble.[43] In other words, because all class members did not necessarily rely on electronic gaming devices presenting the same odds (or formulating odds in the same manner) as their mechanical counterparts, an individualized showing of reliance was required.[44]

Here, the plaintiffs' claims would be similar to those raised in *Poulos* only if they had alleged that Ignite misrepresented some intricacy of, for example, its compensation policy. If that were the case, we could correctly conclude that an alleged misrepresentation of the inner workings of Ignite would not warrant an inference of reliance because such information would likely be irrelevant to most class members' choice to participate. But that is not the case here: The plaintiffs allege a much more fundamental misrepresentation by the defendants, *viz.*, that Ignite is a legal venture when, instead, it is an illegal pyramid scheme meant to defraud its participants. As other courts have recognized, the choice to participate in a financial transaction does not implicate the same range of possible incentives as does the decision to gamble or to purchase a particular type of cigarette.[45]

---

[42] *Poulos*, 379 F.3d at 659–60.

[43] *Id.* at 665–66.

[44] *Id.*

[45] *See CGC Holding Co.*, 773 F.3d at 1092 ("Unlike entering into a serious financial transaction, many people gamble without any consideration, let alone reliance, on the

No. 14-20128

Finally, the plaintiffs advance that individuals will not knowingly participate in illegal pyramid schemes because it requires them to defraud those who they recruit, often family and friends. The panel majority rejects this reasoning, suggesting—gratuitously and without record basis—that, like the gambler, participants in pyramid schemes might act at the expense of their family and friends. This analogy is strained at best. Unlike "spending money on gambling," which, according to the majority, "harms an individual's family," a pyramid schemer's success in this example depends not on expending his or her family's resources, but, instead, on exploiting his or her family members.

## III.

I conclude my dissent where I began: By holding that the mere possibility that a few random revelations by individuals associated with the defendants can somehow defeat class certification despite our owing great deference to the district court that decided otherwise, the panel majority gives putative illegal pyramid schemes a Teflon coating, protecting them not only from class actions but, as a practical matter, from any suits claiming fraud, whether civil RICO or otherwise. One of the core reasons that class actions exist is to give large groups of minor players like the instant plaintiffs a way to have their claims heard in court. Because, by definition, none of the individual claims can ever amount to enough dollars to justify separate and individual litigation, the

---

representations about the likelihood of striking it rich. Nor does every slot player spend any serious money expecting something (other than a good time, perhaps) in return."); *McLaughlin*, 522 F.3d at 225 n.7 (distinguishing the choice to enter a financial transaction from making a consumer purchase because "a financial transaction does not usually implicate the same type or degree of personal idiosyncratic choice as does a consumer purchase"); *Cohen*, 303 F.R.D. at 386 ("[U]nlike gambling, purchasing real estate seminars is not the type of consumer activity that is susceptible to wide-ranging behavioral rationales.").

No. 14-20128

elimination of class actions in pyramid schemes insures their total immunity from otherwise viable civil claims.

For the foregoing reasons, I respectfully DISSENT.